Filed 6/17/16  P. v. Murphy CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E062132 |
| v. | (Super.Ct.No. FSB902633) |
| THOMAS JOSEPH MURPHY, | O P I N I O N |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Michael A. Sachs and R. Glenn Yabuno, Judges.\* Affirmed with directions.

Ronald R. Boyer, under appointment by the Court of Appeal, for Defendant and Appellant.

---

\* Judge Sachs terminated defendant's in propria persona status and Judge Yabuna presided at the trial, sentencing, and the motion for new trial.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Arlene A. Sevidal and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

## I.  INTRODUCTION

A jury found defendant and appellant, Thomas Joseph Murphy, guilty of committing 14 felony offenses involving four victims, and cruelty to an animal, a dog, based on a June 22, 2009, incident at the home of Andrew Lofton.  The jury also convicted defendant on three counts of dissuading witnesses to the crimes (Pen. Code, § 136.1, counts 14-16)[1] based on his actions following the June 22, 2009, incident.

The jury found defendant committed the witness dissuasion counts for the benefit of a criminal street gang, and the court found defendant had two prior strike convictions, one prior serious felony conviction, and three prison priors.  The court denied defendant's motion for a new trial, and sentenced him to an aggregate term of 73 years plus 175 years to life in prison.

On this appeal, defendant raises multiple claims of error:  (1) before the trial commenced, the court abused its discretion and violated his federal constitutional rights in revoking his right to represent himself under *Faretta*;[2] (2) during trial, the court improperly delegated to the bailiff the court's authority to determine whether to handcuff defendant and remove him from the courtroom; (3) during jury voir dire, the court

_____

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

[2]  *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

2

improperly diluted the reasonable doubt standard by equating witness credibility determinations to everyday life decisions; (4) insufficient evidence supports his convictions in counts 4 through 7 for assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)); (5) the jury should have been instructed on the lesser included offense of simple assault in counts 4 through 7; (6) insufficient evidence supports the "primary activities" and "pattern of criminal gang activity" elements of the gang enhancements on his witness dissuasion convictions in counts 14 through 16 (§ 186.22, subds. (e), (f)); and (7) the cumulative effect of these errors requires reversal. We reject each of these claims.

Defendant further contends, and the People and we agree, that defendant's 73 years plus 175-year-to-life sentence must be modified to strike the 10-year consecutive terms imposed based on the gang enhancements in counts 14, 15, and 16. (§ 186.22, subd. (b)(4).) The sentence must also be modified to impose a minimum parole eligibility period of seven years on each of the 25-year-to-life terms on counts 14, 15, and 16. (§ 186.22, subd. (b)(4)(C).) We modify the judgment to correct this gang enhancement sentencing error, but we affirm the judgment in all other respects.

## II. FACTS AND PROCEDURAL HISTORY

A. *Trial Evidence*

### 1. The June 22, 2009, Incident

On June 22, 2009, Teresa Pelczynski drove to Lofton's house in Crestline. Defendant's girlfriend, Kristin Westenhaver, had spent the previous night at the house and

3

was there when Pelczynski arrived. Pelczynski left the house, went to the store, and returned with vodka. Thereafter, her car alarm went off, and she went outside.

Pelczynski saw defendant, Westenhaver's boyfriend, getting out of the backseat of her car. Pelczynski asked defendant what he was doing in her car, then began walking back towards the house. Defendant looked angry, told Pelczynski, "stay right there, bitch," then grabbed Pelczynski's arm and escorted her into the house. Defendant began "ranting and raving," asking questions about where Westenhaver had been the night before.

After the group initially ignored him, defendant grabbed Westenhaver's dog, took the dog upstairs to a loft, tied the dog's leash to a handrail, and threw the dog over the railing, hanging the dog. After a minute or two, defendant began laughing, stated, "now I have your attention," and released the dog.

Defendant demanded that Lofton, Westenhaver, and Pelczynski sit on the couch downstairs, and they complied. Defendant continued to ask questions and make accusations about where Westenhaver was the night before. He began taking strips of duct tape and sticking them to the wall or ceiling beam. He sprayed butane lighter fluid on Lofton, Westenhaver, and Pelczynski as they sat on the couch, and he threatened to set them on fire and kill them if they continued to lie. Pelczynski testified that defendant looked "all over the house" for a lighter, but never found one. Lofton testified that defendant "eventually [found] a lighter."

At some point, Amber Guy arrived at the house. Though he had barricaded the front door with speakers and furniture, defendant moved these items aside and let Guy into the

4

house.  Defendant told Guy to sit on the couch with the others.  When Guy refused to comply, defendant, while holding a knife, sprayed Guy with lighter fluid, said he was going to light her on fire, and hit her in the face twice.  Guy sat down near the others.

When Pelczynski tried to get up from the couch, defendant struck her leg with the claw end of a hammer, hurting her badly and causing her leg to bleed.  Pelczynski received stitches for the injury.  Defendant's nickname was "Corporal."  He was called "Corporal" because if anyone got in his way, he used corporal punishment.

At some point, defendant ordered Westenhaver to go upstairs and have sex with him.  He also ordered Pelczynski to come upstairs, and she complied, but came back downstairs while defendant and Westenhaver were having sex.  In an attempt to calm defendant, Lofton left the house to get methamphetamine and returned around two hours later.

While defendant was still upstairs with Westenhaver, Guy and Pelczynski moved the barricades away from the front door, went outside, and Guy drove away in her car.  Pelczynski went back inside the house as Guy was leaving because defendant came outside and told her to come back inside the house.

Guy later returned to the house with Pelczynski's boyfriend.  Guy, Pelczynski, and Pelczynski's boyfriend then drove to a friend's house.  The police arrived at the friend's house, and suggested that Pelczynski go to the hospital.  When the police arrived at Lofton's house, defendant and Westenhaver were not there; they had gone to defendant's sister's basement, where they hid from the police.  The entire incident at Lofton's house lasted around eight hours.

2. Evidence of Witness Intimidation

Richard Neria testified that defendant asked that he get Pelczynski, Westenhaver, Lofton, and Guy to change their statements to police. On one occasion, when Neria was with Guy, defendant called Neria, and Neria handed the telephone to Guy. Defendant would call Neria, asking that Neria contact Pelczynski, Westenhaver, Lofton, and Guy in three-way telephone calls.[3]

Similarly, in August 2009, Robert Stewart, aka "Rooster," began receiving telephone calls from defendant. Defendant asked Stewart for his help regarding victims and witnesses who were going to be testifying against him. Stewart agreed to help because defendant "was a comrade, a fellow skinhead."[4]

Defendant and Stewart spoke to Westenhaver about changing her statement to the police. Defendant wanted Westenhaver to say that Pelczynski was hit with a hammer during rough sex, which was untrue. Defendant also asked Westenhaver to get in touch with Pelczynski about changing her statement. Following the preliminary hearing, Stewart received a threatening letter from defendant.

---

[3] Neria was charged with attempting to dissuade a witness for the benefit of a criminal street gang, and entered into a plea agreement in exchange for his truthful testimony at trial.

[4] Stewart was also charged with attempting to dissuade witnesses for the benefit of a criminal gang, and entered a plea agreement in exchange for his truthful testimony at trial.

At some point after the June 22, 2009, incident, Pelczynski was contacted by someone who told her to "change [her] testimony completely" and state that she was in a threesome and "was having sex willingly and got hit in the leg with a hammer." Defendant also spoke to Guy following the incident and told Guy he did not want her to testify.

Deputy Sheriff Rocky Johnson testified that, during defendant's preliminary hearing on April 8, 2010, defendant, with his fists clenched, aggressively leaned up on counsel table and began mouthing something towards Westenhaver, who was testifying. After this incident, Westenhaver felt threatened and was nervous and concerned. She did not want to continue with her testimony.

### 3. Gang Evidence

On March 7, 2009, defendant told a deputy at the West Valley Detention Center that he was a member of the Aryan Nation gang. Similarly, on June 24, 2009, defendant told a classification officer at the jail that he was an active member of the Aryan Nation gang, with a moniker of "Corporal."

The prosecution called Deputy Probation Officer Lowell Smith, who testified as a gang expert. The details of Officer Smith's testimony are described below, in connection with our discussion of defendant's claim that insufficient evidence supports the gang enhancements on his witness dissuasion convictions in counts 14, 15, and 16.

## B. *Verdicts and Sentencing*

The jury found defendant guilty as charged of false imprisonment by violence, in counts 1 through 3, of Pelczynski, Guy, and Westenhaver (§ 236); assault by means of

force likely to produce great bodily injury, in counts 4 through 7, against Pelczynski, Guy, Lofton, and Westenhaver (§ 245, subd. (a)(4)); assault with a deadly weapon, in count 8, against Pelczynski (§ 245, subd. (a)(1)); battery, in count 9, of Guy (§ 242); criminal threats, in counts 10 through 13, of Pelczynski, Guy, Lofton, and Westenhaver (§ 422); dissuading a witness, in counts 14 through 16, namely, Guy, Lofton, and Westenhaver, (§ 136.1); and cruelty to an animal in count 17 (§ 597, subd. (a)). As indicated, the jury also found gang enhancement allegations true on the witness dissuasion convictions in counts 14 through 16. Defendant's motion for a new trial was denied, and he was sentenced to 73 years plus 175 years to life in prison.

## III. DISCUSSION

A. *The Trial Court Properly Revoked Defendant's in Propria Persona Status Before Trial, Based on His Attempt to Intimidate Prosecution Witnesses*

    1. <u>Relevant Background</u>

Defendant's motion to represent himself was granted on October 30, 2009, before the preliminary hearing and after defendant signed a *Faretta* waiver form. On April 30, 2010, after the information was filed, defendant signed a second *Faretta* waiver and the court signed a second *Faretta* order, again allowing defendant to represent himself in propria persona (pro. per.).

On February 25, 2011, the prosecution orally moved to terminate defendant's pro. per. status. The court set a March 4 hearing on the motion, and advised defendant to be prepared to address the prosecutor's concerns, which included, as the prosecutor

described it, defendant's "us[e] [of] his pro per status to recruit subjects to take out" prosecution witnesses. At the March 4 hearing, the prosecution told the court that its "specific concern" was that defendant was "continu[ing] to try to intimidate" prosecution witnesses by "laying [them] out . . . as snitches" to fellow gang members.

The prosecution adduced two letters written by defendant, from the West Valley Detention Center, each marked "legal mail" and addressed to the same post office box in Crestline. The first letter, dated December 16, 2010, was addressed to the "Law Offices Of: [¶] Youngblood & Associates [¶] Mr. Youngblood, J.D." The second letter, dated December 20, 2010, was addressed to "Law Office Of Mr. Kata Jedenne." Defendant admitted he sent both letters and that they were intended to be addressed to a lawyer named "Kenneth Jedenne Youngblood." The court noted that the California State Bar did not list any attorney by the name of "Kata Jedenne," and did not list an attorney by the name of "Youngblood" practicing law in the Crestline area.

The December 16 letter asked its recipient to "contact" "Mr. Ferguson of High Wire Investigations," concerning defendant's case, and also asked its recipient to send defendant a care package consisting of 18 food and toiletry items, along with "stamps and stickers." The court said: "This has no relationship at all to your case, and for you to suggest to the Court that you sent this letter to this individual as a work product for this particular case is just not believable."

9

The court was "specifically" and "very concerned" with the December 20 letter and the tone of the letter. This letter referred to the four alleged victims in the case: "1) Andy Lofton; 2) Amber Guy; 3) Kristin Westenhaver; and, 4) Terresa Pelczynski" and discussed their credibility and anticipated testimony. The letter also stated: "[I]f you want to get me un-read mail, use a fake law firm name, and a fake attorneys name. Even a fake address. I'll get it."

The December 20 letter also asked its recipient to place two classified advertisements in the Alpenhorn, a newspaper in the Crestline area where the charged crimes occurred and witnesses to the crimes were located. The first ad was to read: "Terresa P. I'm proud of you. Keep the wind at your back. Send me a message if I can help. Corporal." The second ad was to be placed in the "Help Wanted" section and was to read: "Confidential Informants wanted. No experience needed. Will train you to testify. For info. and details contact Kristin Flowers or Ricky Neria at: 333-RATS, or 333-0600 or Kristin F. Your cover is blown. Come in. The D.A." The December 20 letter continued: "I . . . would like to open the paper . . . and read those ads. And I'm sure it wouldn't exactly hurt matters for 100's of others to read it."

When questioned by the court, defendant admitted he sought to place the ads in the Alpenhorn and that one of his purposes for doing so was "to let everybody else know if they'll lie on me, they'll lie on you." In other words, defendant admitted he wanted to let people in the Crestline area know that Kristin Flowers and Ricky Neria, who had been identified as potential witnesses against him in the case, were "rats." The trial court

10

denied defendant's request to continue the hearing and his request to call an unidentified witness, noting that: "I don't think we need a witness. You admitted that the reason why you sent that letter with those classified ads is to let everybody know that these two people are rats. These two people are identified as potential witnesses in your case. That's enough." The court also said: "[F]or someone to suggest that this is not witness intimidation would be a ridiculous position to take."

Lastly, based on a transcript of a recorded telephone call defendant made from jail, which was provided to defendant before the March 4 hearing, the court noted: "It appears to the Court that the defendant would contact one . . . individual on the phone, and then the defendant would ask that individual to contact and forward his phone call to another individual in a series of forwarded phone calls. Again, in [an] attempt . . . to be circumventing the pro per procedures at the San Bernardino County Sheriff's Department." After acknowledging its duty to consider alternative sanctions to terminating defendant's pro. per. status, the court said: "This Court would find that there's no other sanction feasible. This Court cannot devise any sanction that would limit this particular [defendant's] ability to contact anyone for anyone to convey the message that [defendant] would like to be conveyed—that is the intimidation and letting the world know, in his term[s], that these individual[s] are rats and can't be trusted. These individuals again are identified as witnesses in his case in chief." The court then terminated defendant's pro. per. status based on his "intimidation of . . . prosecution witnesses in the case."

11

2. Applicable Law and Analysis

Though criminal defendants have a Sixth and Fourteenth Amendment right to represent themselves (*Faretta*, *supra*, 422 U.S. at pp. 807, 821; *People v. Doss* (2014) 230 Cal.App.4th 46, 54 (*Doss*)), there are limits on the right to act as one's own attorney. (*People v. Butler* (2009) 47 Cal.4th 814, 825.)  "Revoking a defendant's in propria persona status is justified when the defendant has '"deliberately engage[d] in serious and obstructionist misconduct,"' occurring either inside or outside the courtroom [citation], that 'seriously threatens the core integrity of the trial.'"  (*Doss*, *supra*, at p. 55.)

The erroneous termination or revocation of a defendant's pro. per. status is reversible per se.  (*People v. Butler*, *supra*, 47 Cal.4th at p. 824.)  But "[t]he trial court possesses much discretion when it comes to terminating a defendant's right to self-representation and the exercise of that discretion 'will not be disturbed in the absence of a strong showing of clear abuse.'  [Citations.]"  (*People v. Welch* (1999) 20 Cal.4th 701, 735.)  The "trial court must undertake the task of deciding whether a defendant is and will remain so disruptive, obstreperous, disobedient, disrespectful or obstructionist in his or her actions or words as to preclude the exercise of the right to self-representation."  (*Ibid.*)  "[O]ne reason for according deference to the trial court is that it is in the best position to judge defendant's demeanor."  (*Ibid.*)

As explained in *People v. Carson* (2005) 35 Cal.4th 1, 9 (*Carson*):  "One form of serious and obstructionist misconduct is witness intimidation, which by its very nature compromises the factfinding process and constitutes a quintessential 'subversion of the

12

core concept of a trial.' [Citation.] 'A defendant acting as his own attorney has no greater privileges than any member of the bar. He may not disrupt proceedings or intimidate witnesses. [Citations.] . . . The trial court can stop harassment and abuse of a witness by a threatening defendant and can terminate self-representation by a defendant who engages in serious misconduct. [Citations.]' [Citation.] Threatening or intimidating acts are not limited to the courtroom. [Citation.] *When a defendant exploits or manipulates his in propria persona status to engage in such acts, wherever they may occur, the trial court does not abuse its discretion in determining he has forfeited the right of continued self-representation.*" (Italics added.)

Here, the trial court plainly did not abuse its discretion in terminating or revoking defendant's pro. per. status, given that defendant admitted he used his pro. per. privileges to send mail, falsely labeled "legal mail" and addressed to a "fake" attorney in the Crestline area, to solicit the recipient to intimidate two prosecution witnesses by placing an ad in a local newspaper identifying the witnesses as "rats" or "snitches." If successful, the intimidation of these witnesses by dissuading them from testifying or from testifying truthfully to any extent, would have directly undermined the factfinding process and "the core integrity" of the trial. (*Carson*, *supra*, 35 Cal.4th at p. 9; see *Doss*, *supra*, 230 Cal.App.4th at p. 55.)[5]

---

[5] It was unnecessary to show that defendant actually succeeded in dissuading any witness from testifying. The likely, not the actual, effect of defendant's misconduct was the primary factor the court had to consider, and did consider, in determining whether to terminate his pro. per. status. (*Carson*, *supra*, 35 Cal.4th at p. 10.)

Defendant maintains that "alternative sanctions" to terminating or revoking his pro. per. status were available and should have been imposed. To be sure, courts are required to consider "the availability and suitability of alternative sanctions" in determining whether to terminate the defendant's right of self-representation. (*Carson*, *supra*, 35 Cal.4th at p. 10.) "Misconduct that is more removed from the trial proceedings, more subject to rectification or correction, or otherwise less likely to affect the fairness of the trial may not justify complete withdraw [or denial] of the defendant's right of self-representation. [Citations.] The court should also consider whether the defendant has been warned that particular misconduct will result in termination of in propria persona status." (*Ibid*.) Defendant specifically argues that "there [were] alternative sanctions for [his] misconduct of sending letters marked 'legal mail' to persons who are not attorneys. The trial court was able to determine with a simple search on the [W]eb site of the California State Bar that the addressee of [his] letters was not a lawyer. . . . It would not be unduly burdensome, with respect to any letters that [defendant] has marked 'legal mail' for the Sheriff to screen the outgoing mail of [defendant] in the same way." We disagree.

The court expressly considered limiting or monitoring defendant's pro. per. privileges, including his use of the telephones and the mail, but reasonably determined there were no feasible means of preventing him from using his pro. per. status to engage in witness intimidation. Ostensibly, the court, after reviewing the evidence and defendant's demeanor during the March 4 hearing, reasonably concluded that defendant

14

could not be trusted to follow the court's directives or the rules of the sheriff's department. The court pointed out that defendant had already used the telephones to call one individual, who then called another who connected defendant to that person. (The court did not say whom defendant had contacted or spoken with in this call.) Thus, it appears that, short of terminating his pro. per. status, defendant could not be trusted *not* to use the telephones and the mail to attempt to intimidate prosecution witnesses and undermine the core integrity of the trial.

Defendant's reliance on *Doss*, *supra*, 230 Cal.App.4th 46, is misplaced. In *Doss*, the trial court applied an incorrect standard in revoking the defendant's pro. per. status, because (1) the court evaluated the defendant's misconduct in jail under *Wilson v. Superior Court* (1978) 21 Cal.3d 816, which allows a defendant's pro. per. *privileges*, as opposed to pro. per. status, to be revoked based on the defendant's out-of-court misconduct "*without regard to the misconduct's effect on the court proceedings*," and (2) the court failed to consider the availability and suitability of alternative sanctions to revoking the defendant's pro. per. status. (*Doss*, *supra*, at p. 57.) As a result of its reliance on *Wilson*, the trial court in *Doss* did not determine whether, under the standard for revoking a defendant's pro. per. *status*, the defendant's misconduct amounted to "'serious and obstructionist misconduct'" (*People v. Butler*, *supra*, 47 Cal.4th at p. 825) that "seriously threaten[ed] the core integrity of the trial" (*Carson*, *supra*, 35 Cal.4th at p. 11). The *Doss* court thus remanded the matter to the trial court to determine whether the defendant's pro. per. status was revocable under the proper standard. (*Doss*, *supra*, at pp.

15

57-58.) The *Doss* court recognized that the defendant's intimidation of a witness may have justified revoking his pro. per. status. (*Id*. at pp. 56-57.) But the trial court here, unlike the trial court in *Doss*, relied on the proper legal standard in denying defendant's *Faretta* motion. The trial court here also considered the feasibility of imposing alternative sanctions, including limiting or monitoring defendant's telephone calls and mail, but reasonably found them insufficient.

Lastly, defendant argues that the court abused its discretion in relying upon several improper factors in revoking his pro. per. status—factors which did not seriously threaten the core integrity of the trial and which were subject to rectification or correction (*Carson, supra,* 35 Cal.4th at p. 10), namely, his several and ongoing abuses of his pro. per. jail privileges. This argument is based on the comments at the outset of the March 4 hearing, where the court expressed concern that defendant had been abusing his pro. per. jail privileges in violation of court orders and the jail's rules and procedures governing pro. per. inmates. The court pointed to several examples of defendant's abuse: (1) by his December 16 letter, defendant requested the care package of food and other items, the letter was falsely labeled "legal mail," and the care package request had no relationship "at all" to defendant's case; (2) defendant asked the recipient of the letter to (falsely) mark all letters to defendant as "legal mail" so the letters would not be opened and reviewed by jail staff; (3) the recipient was apparently a defense witness, the letter revealed information about the case to the witness, and asked the witness to "assist" defendant with the information and discuss it with defendant's investigator; and (4) in

16

calls from the jail, defendant had recipients of the calls forward the calls several times, in an apparent effort to disguise the ultimate recipients of the calls. The entire point of the court's references to defendant's abuses of his pro. per. jail privileges was that defendant had been abusing the privileges to circumvent court orders and jail rules and procedures, intimidate witnesses, and undermine the core integrity of the trial. Defendant's attempt to parse the court's comments into separate and insufficient reasons, or improper factors, for terminating his pro. per. status is an inaccurate reading of the record.

B. *The Handcuffing and Temporary Removal of Defendant from the Courtroom Was Supported by a Manifest Need to Maintain Courtroom Security*

Defendant claims the trial court abused its discretion in delegating to the bailiff and the sheriff's department the court's authority and duty to decide whether to handcuff defendant, in the presence of the jury, and remove him from the courtroom following his outburst during the prosecution's direct examination of Guy. As we explain, the handcuffing and temporary removal of defendant from the courtroom was proper, because it was supported by a manifest need to maintain courtroom security, and any error was harmless beyond a reasonable doubt.

1. Relevant Background

While Guy was testifying, defendant interjected: "You should stop lying. [¶] . . . [¶] . . . That's what you should do." When the trial court admonished defendant to "restrain your outbursts, sir," defendant responded, "Look man, let her talk. *If I have*

17

*something to say, I am going to fucking say it.* She's fucking lying. We have a parade of people up here lying." (Italics added.)

At that point, defendant began to stand up.[6] Defendant scooted his stationary chair back four to six inches, and raised himself up four to six inches, before the bailiff put his hand on defendant's shoulder and defendant sat back down. The bailiff quietly told defendant not to stand, to lower his voice, and not to curse. In response, defendant told the bailiff he was going to "say what [he] want[ed] to say." The jury heard defendant say: "*I will talk to who fucking I want to talk to*." (Italics added.)

The court then said: "[Defendant], do you want to continue, or would you like to be removed from the courtroom?" Defendant responded: "Judge, I am tired of seeing people go up there and lie, one after the next. I gave him [defense counsel] a list of questions to prove it, and he's not asking them." The witness (Guy) interjected: "So everyone is lying but you? I am just saying." After the court admonished Guy not to speak out of turn by saying, "Ma'am," the bailiff handcuffed defendant, and he and another deputy escorted defendant from the courtroom. Guy began to cry. Defendant did not resist being handcuffed or taken out of the courtroom. According to the bailiff, the handcuffs were used for the safety of the jury and courtroom staff.

---

[6] At the hearing on defendant's motion for a new trial, the bailiff testified to what he said to defendant and what defendant said to him, when he put his hand on defendant's shoulder following defendant's outburst.

Outside the presence of the jury, and after the prosecutor had concluded her direct examination of Guy, defendant was returned to the courtroom.  The following colloquy occurred:

"[THE COURT:]  [Defendant], I understand that you may be getting frustrated and having difficulty listening to some of the testimony.  However, the outbursts cannot be tolerated and won't be tolerated.

"THE DEFENDANT:  I understand, Judge.

"THE COURT:  Are you able to restrain yourself and prevent any further outbursts?

"THE DEFENDANT:  I will, Judge.

"THE COURT:  Do you understand that any further outbursts will result in your immediate removal from the courtroom and the trial will continue without you?

"THE DEFENDANT:  I understand that, Judge.

"THE COURT:  All right.  [¶]  Are you going to be able to contain yourself without the shackles on, [defendant]?

"THE DEFENDANT:  Yeah.

"THE COURT:  All right.  At this point I will order that [defendant] be unshackled."

"[DEFENSE COUNSEL]:  Thank you.

"THE DEFENDANT:  You know, though, Judge, I think the cat may already be out of the bag on that one.  [¶]  You know what I mean?

19

"THE COURT: We have to play by the book."

After the jury returned its verdicts, defendant filed a motion for a new trial, claiming he was denied due process by the "unjustified removal of his person from the courtroom, *after he had been placed in handcuffs in the presence of, in front of, and in view of the jury.*"

After hearing argument from both parties, the trial court denied defendant's motion for a new trial, stating: "What remains to be addressed is the issue of [defendant's] removal from the courtroom during the testimony of Amber Guy, and whether the Court committed error in allowing that to occur. I know that there were many cases cited by [defense counsel], *Deck* [*v. Missouri* (2005) 544 U.S. 622] and [*People v.*] *Hill* [(1998) 17 Cal.4th 800] being two of them. However, the Court believes that there is a distinct difference, that those cases involve shackling during the course of the trial, defendants being confined while in trial rather than some instance of handcuffing or shackling as referred to by [defense counsel] during the course of the trial based on conduct caused by [defendant]."

Addressing defendant's claim that his verbal outbursts and standing up from his chair were insufficient to justify his removal from the courtroom, the court noted that defense counsel was arguing that the handcuffing and removal of defendant from the courtroom, "which the Court did not specifically direct," so prejudiced defendant in the eyes of the jury that it could not be viewed as harmless error.

The court rejected this claim, noting that: "The conduct exhibited by [defendant], as testified to by [the bailiff], did cause the witness [Amber Guy] to be in fear. [Defendant] was given an opportunity to calm down and refrain from making further comments. Following that he continued to make comments *and attempted to stand up*, that resulted in his being . . . handcuffed and being removed from the courtroom. This Court does not believe it is necessary for a further threat to be allowed to take place in order for the security of the courtroom to be maintained. *The security of the courtroom is an obligation delegated to the sheriff's department. Whether or not the Court specifically directed [defendant] to be handcuffed and removed, this [in] my opinion, is not a central issue. The central issue was, was it the conduct of [defendant] that caused his removal from the courtroom? And my belief is that it is and it was.*" (Italics added.) Lastly, the court observed that Guy was subject to recall but was never recalled, and defendant's removal during the balance of her direct examination did not support a mistrial and a new trial.

2. <u>Analysis</u>

The due process clauses of the Fifth and Fourteenth Amendments prohibit a criminal defendant from being physically restrained, in a manner visible to the jury, absent the trial court's determination that the restraints are justified by a state interest specific to the defendant on trial, including the maintenance of courtroom security. (*Deck v. Missouri* (2005) 544 U.S. 622, 628-629; *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 389.)

21

California law similarly prohibits a defendant from being subjected to physical restraints of any kind in the courtroom, in the presence of the jury, absent a showing of a "manifest need" for the restraints. (*People v. Hill* (1998) 17 Cal.4th 800, 841; *People v. Duran* (1976) 16 Cal.3d 282, 290-291; § 688 ["No person charged with a public offense may be subjected, before conviction, to any more restraint than is necessary for his detention to answer the charge."].) "'Manifest need' arises only upon a showing of unruliness . . . or '[e]vidence of any nonconforming conduct or planned nonconforming conduct which disrupts or would disrupt the judicial process if unrestrained . . . .'" (*People v. Cox* (1991) 53 Cal.3d 618, 651.) The conduct that supports a showing of a manifest need must appear as a matter of record. (*People v. Vance* (2006) 141 Cal.App.4th 1104, 1112.) And, "in any case where physical restraints are used those restraints should be as unobtrusive as possible, although as effective as necessary under the circumstances." (*People v. Duran*, *supra*, at p. 291, fn. omitted.)

Under both the federal Constitution and California law, it is the trial court, not law enforcement or security personnel, that must determine whether to physically restrain the defendant in the presence of the jury, and the court abuses its discretion "if it abdicates this decision-making responsibility to security personnel or law enforcement." (*People v. Hill*, *supra*, 17 Cal.4th at p. 841, citing *People v. Jackson* (1993) 14 Cal.App.4th 1818, 1825; *Deck v. Missouri*, *supra*, 544 U.S. at p. 629.) Here, the bailiff, not the trial court, made the decision to remove defendant temporarily from the courtroom and handcuff him as he was being removed. At the hearing on defendant's new trial motion, the bailiff

22

testified he understood that it was his "call" to handcuff defendant and remove him. According to the bailiff, the judge had "left it up to [him] to make that decision." The court confirmed the bailiff's understanding when, in denying the new trial motion, the court observed that maintaining courtroom security was "an obligation delegated to the sheriff's department."

But as the People point out, the cases defendant relies upon, including, for example, *People v. Hill*, *supra*, 17 Cal.4th at page 841, involved the improper delegation by the trial court, to the sheriff's department, of the court's duty to determine whether to shackle a defendant during the entire trial. By contrast, this case involves "the decision to handcuff [defendant] and remove him from the courtroom was based on exigent circumstances perceived by the [bailiff] who was concerned with the safety of those in the courtroom." We agree this is an important distinction.

As the People point out: "It would be unreasonable, and outside the scope of the authorit[ies] [defendant] relies on, to require that the [bailiff] call a timeout in the midst of a volatile situation and seek the trial court's permission to shackle the defendant who is disrupting the courtroom proceedings. The case law explaining that a trial court abuses its discretion if it abdicates [its] decisionmaking responsibility regarding shackling of a defendant to security personnel does not address an emergent situation where courtroom security [personnel are] required to make quick decisions based upon the safety of others."

In any event, the handcuffing or shackling, and temporary removal of defendant from the courtroom, were amply supported by a manifest need to maintain the security of the jury, the court staff, and the other people in the courtroom. (*People v. Hill*, *supra*, 17 Cal.4th at p. 841; cf. *People v. Soukomlane* (2008) 162 Cal.App.4th 214, 229-230.) It is also clear from the trial court's comments in denying defendant's motion for a new trial that the court would have promptly—and justifiably—ordered defendant handcuffed and removed from the courtroom had the bailiff not promptly taken the initiative to do so.

Indeed, based on his verbally and physically aggressive and threatening outburst during the direct examination of Guy, defendant was a manifest security threat. He pushed his chair back and tried to stand up when he said to the court: "Look, man, let her [Guy] talk. If I have something to say, I am going to fucking say it. She's fucking lying." Then, after the bailiff placed his hand on defendant's shoulder, told him not to stand up, to lower his voice, and not to swear, and after the trial court warned defendant that he would be removed from the courtroom if he did not restrain himself, defendant openly defied the court by saying: "I will talk to who fucking I want to talk to." Given defendant's defiance of the bailiff's and the trial court's authority, defendant manifestly needed to be handcuffed and removed from the courtroom so that the security of the courtroom could be maintained.

Defendant emphasizes that he tried to stand up only once and he did not attempt to stand up again after the bailiff put his hand on his shoulder. But defendant's *single attempt* to stand up as he openly defied and swore at the trial court was a sufficient

24

showing of a manifest need to maintain court security by handcuffing defendant and temporarily removing him from the courtroom. As the trial court recognized, there was no need to increase the security threat by giving defendant a chance to become even more verbally and physically aggressive and threatening before he was handcuffed and removed.

### 3. Any Error Was Harmless Beyond a Reasonable Doubt

Further, any error in handcuffing and temporarily removing defendant from the courtroom was harmless beyond a reasonable doubt. "Under the federal Constitution, where a court ordered a defendant, without adequate justification, to wear restraints that were seen by the jury, the state must prove beyond a reasonable doubt that the unjustified shackling did not contribute to the verdict." (*People v. Ervine* (2009) 47 Cal.4th 745, 773; *Deck v. Missouri*, *supra*, 544 U.S. at p. 635.) A jury's brief observations of a defendant's physical restraints have generally been found nonprejudicial. (*People v. Cleveland* (2004) 32 Cal.4th 704, 740; *People v. Tuilaepa* (1992) 4 Cal.4th 569, 584 ["Prejudicial error does not occur simply because the defendant 'was seen in shackles for only a brief period either inside or outside the courtroom by one or more jurors . . . .'"].) Defendant's handcuffing was brief; it occurred only when he was being escorted out of the courtroom. He was also promptly returned to the courtroom, before his defense counsel began to cross-examine Guy, and he remained unhandcuffed and otherwise unshackled during the rest of the trial.

The jury was also given CALCRIM No. 337, which instructed it to "completely disregard" the fact that defendant had been restrained. It stated: "During a period of time the Defendant was physically restrained. Do not speculate about the reason. You must completely disregard this circumstance in deciding the issues in this case. Do not consider it for any purpose or discuss it during your deliberations." We presume that the jury followed the court's instructions. (*People v. Cruz* (2001) 93 Cal.App.4th 69, 74.) Given the brevity of the handcuffing and removal incident, and the unequivocal jury instruction to completely disregard it, the handcuffing and removal incident could not have affected the jury's verdicts or findings.

C. *It Is Not Reasonably Likely That the Jury Misconstrued the Trial Court's Voir Dire Remarks—Equating the Jury's Witness Credibility Determinations With Everyday Life Decisions—as Diminishing the Prosecution's Burden to Prove the Facts Essential to the Convictions Beyond a Reasonable Doubt*

Defendant claims that, during jury voir dire, the trial court equated the credibility determinations that the jurors would be required to make with the decisions of everyday life, thereby diminishing the prosecution's burden to prove beyond a reasonable doubt each fact essential to the convictions, in violation of his constitutional rights. We conclude there is no reasonable likelihood that the jury misconstrued the trial court's comments to diminish the proof-beyond-a reasonable doubt standard.

26

1. Relevant Background

During jury voir dire, the trial court explained that the jurors would have to determine the credibility of witnesses based upon their background and experiences, and to illustrate the point, engaged in the following colloquy with the prospective juror in seat No. 9:

"[THE COURT:] We're going to be hearing from a number of witnesses as you've heard. And it is up to you as jurors to decide the relative credibility of each one of those witnesses based on your own background and experiences. . . . Juror number nine, you indicated that you have a couple of kids, right?

"JUROR IN SEAT 9: Yes.

"THE COURT: During the course of [your kids] growing up I'm sure they had disagreements, and you were called upon to decide who you believe and who you didn't, correct?

"JUROR IN SEAT 9: Yes.

"THE COURT: How did you do that?

"JUROR IN SEAT 9: Want to find out what the dispute is all about first, what they are fighting for or what is the reason why they're fighting.

"THE COURT: So you do some fact finding. And then what factors would you generally consider when you're talking to them as you're evaluating their credibility?

"JUROR IN SEAT 9: I guess basically want to know where it happened first 'cause my kids fought a lot when they were teenagers. So I can relate to that. And if

27

they said it happened here in the house, that's when I really get angry. I don't like it to be happening in the house.

"THE COURT: Were you able to make a decision as to which one you believed?

"JUROR IN SEAT 9: Yes.

"THE COURT: Make a decision who was more credible?

"JUROR IN SEAT 9: Yes. Based on I would call his friend and her friend, and is it true they fought in the parking lot in school, if that's where it was.

"THE COURT: Did you also judge it somewhat on how they answered questions that you posed to them?

"JUROR IN SEAT 9: Yeah.

"THE COURT: Body language? Demeanor?

"JUROR IN SEAT 9: Yes.

"THE COURT: Eye contact?

"JUROR IN SEAT 9: Right.

"THE COURT: What they stood to gain and lose, all those factors?

"JUROR IN SEAT 9: Yes.

"THE COURT: And we've all been called upon to judge the credibility and believability of family members, children, friends, co-workers. [¶] Anybody believe they'll have any difficulty weighing and evaluating the witnesses' testimony as you have in the past with other people? Anybody think they'll have any difficulty?"

2. <u>Analysis</u>

"The reasonable-doubt standard plays a vital role in the American scheme of criminal procedure. It is a prime instrument for reducing the risk of convictions resting on factual error. The standard provides concrete substance for the presumption of innocence—that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law.'" (*In re Winship* (1970) 397 U.S. 358, 363.) Accordingly, the due process clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he [or she] is charged." (*Id*. at p. 364; see also *People v. Watson* (1956) 46 Cal.2d 818, 831 ["[T]he doctrine of reasonable doubt [applies] . . . to proof of 'each fact which is essential to complete a chain of circumstances that will establish the defendant's guilt.'"].)

The People argue that defendant forfeited his right to appellate review of the trial court's comments during jury voir dire, because he did not object in the trial court that the comments diminished the prosecution's burden to prove beyond a reasonable doubt the facts underlying the charged enhancements. "[E]ven in the absence of an objection the accused has a right to appellate review of any instruction that affects his or her substantial rights." (*People v. Johnson* (2004) 119 Cal.App.4th 976, 984; § 1259.) And here, the question of whether the trial court's comments diminished the standard of proof beyond a reasonable doubt affected defendant's substantial, due process right to conviction upon proof beyond a reasonable doubt. (*People v. Johnson*, *supra*, at p. 984.)

Additionally, an appellate court may consider important questions of constitutional law, even if the defendant fails to raise the issue below. (*Id.* at pp. 984-985.) Thus, we reject the People's forfeiture argument and address defendant's claim.

To be sure, it is error to suggest to jurors that the reasonable doubt standard is the same standard the jurors employ in their everyday life decisions undermines or diminishes the reasonable doubt standard. (*People v. Nguyen* (1995) 40 Cal.App.4th 28, 35-36 [trial court "trivialized" reasonable doubt standard by equating it to the same standard people use in determining whether to change lanes while driving, or to marry]; *People v. Johnson* (2004) 115 Cal.App.4th 1169, 1171-1172 [error to liken reasonable doubt standard to decision to board airplanes and plan vacations].)

As our state Supreme Court long ago observed: "The judgment of a reasonable man in the ordinary affairs of life, however important, is influenced and controlled by the preponderance of evidence. Juries are permitted and instructed to apply the same rule to the determination of civil actions involving rights of property only. But in the decision of a criminal case involving life or liberty, something further is required. . . . There must be in the minds of the jury an abiding conviction, to a moral certainty, of the truth of the charge . . . ." (*People v Brannon* (1873) 47 Cal. 96, 97.)

Here, however, the trial court did not equate or compare the reasonable doubt standard to any sort of everyday life decision, including how to determine witness credibility. During jury voir dire, the trial court equated *witness credibility determinations* to the "everyday life" decision of a parent deciding which of two children

was to be believed. During this entire discussion, the trial court did not mention or allude to the concept of "reasonable doubt" or to the prosecution's burden to prove the charges and enhancements beyond a reasonable doubt. The trial court did not suggest that the jurors could determine whether charges and enhancements had been proved in the same way, or by the same standards, that they could determine whether a witness was credible, or which of the children was to be believed.

"'A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant. [Citations.]' [Citation.] '"[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction."' [Citations.]' [Citation.]" (*People v. Solomon* (2010) 49 Cal.4th 792, 822.)

Here, there is no reasonable likelihood that the jury misunderstood the trial court's jury voir dire discussion as allowing it to convict defendant based on proof less than beyond a reasonable doubt. Shortly before its voir dire discussion concerning witness credibility, the court instructed the venire that a defendant is presumed innocent, and the People had the burden of proving a defendant's guilt beyond a reasonable doubt. Further, the court's discussion of witness credibility focused on how to evaluate conflicting evidence (see CALCRIM No. 302), not the reasonable doubt standard of proof. And, at the conclusion of the trial, the jury was properly instructed that the People had to prove their case beyond a reasonable doubt. (CALCRIM No. 220.) The jury was also

31

instructed that, in evaluating conflicting evidence "[w]hat is important is whether the testimony or any other evidence convinces you . . . ." (CALCRIM No. 302.)

*People v. Johnson*, *supra*, 119 Cal.App.4th 976, upon which defendant relies, is readily distinguishable. There, during jury voir dire, the trial court told the venire that, as jurors, they could find the defendant guilty even if they had "some doubt," and they would be "brain dead" if they rendered a decision with "no doubt." (*Id*. at pp. 979-980.) Moreover, the trial court directly equated *the standard of proof beyond a reasonable doubt* to everyday decisionmaking in a juror's life. (*Id*. at pp. 980-981.) The *Johnson* court reversed the judgment and ordered a new trial, holding that the trial court's "tinkering with the statutory definition of reasonable doubt, no matter how well intentioned, lowered the prosecution's burden of proof below the due process requirement of proof beyond a reasonable doubt." (*Id.* at p. 985.) Here, by contrast, the trial court did not "tinker with the reasonable doubt standard," and it is not reasonably likely that the jury construed the court's brief discussion of witness credibility as undermining the proof beyond a reasonable doubt standard.

D. *Substantial Evidence Supports Defendant's Convictions for Assault by Means of Force Likely to Produce Great Bodily Injury in Counts 4 Through 7*

Defendant claims that insufficient evidence supports his convictions for assault by means of force likely to produce great bodily injury on Pelczynski (count 4), Guy (count 5), Lofton (count 6), and Westenhaver (count 7). (§ 245, subd. (a)(4).) He claims that the convictions were based solely on his act of spraying the victims with butane lighter

fluid, but "there was no evidence of a flame" or other source of ignition, and without such evidence his act of spraying the victims with lighter fluid was unlikely to cause any of them great bodily injury.

We reject this claim. Substantial evidence shows defendant was in possession of a lighter shortly after he sprayed the victims with butane lighter fluid and the victims were still under assault.

In reviewing a challenge to the sufficiency of the evidence supporting a criminal conviction, we review the record "in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) "'[W]e presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence.'" (*People v. Wilson* (2008) 44 Cal.4th 758, 806.) "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Albillar* (2010) 51 Cal.4th 47, 60.) Under this standard, "[r]eversal . . . is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) Further, "[t]he testimony of one witness, if believed, may be sufficient to prove any fact. (Evid. Code, § 411.)" (*People v. Rasmuson* (2006) 145 Cal.App.4th 1487, 1508; CALCRIM No. 301.)

33

"Section 245 'prohibits an assault by means of force *likely* to produce great bodily injury, not the use of force which does in fact produce such injury.'" (*People v. McDaniel* (2008) 159 Cal.App.4th 736, 748.) Thus, the force used to commit an assault likely to produce great bodily injury "must be such as would be likely to produce great bodily injury." (*People v. Covino* (1980) 100 Cal.App.3d 660, 667; see CALCRIM No. 875.) As used in section 245, great bodily injury means significant or substantial injury. (*People v. Brown* (2012) 210 Cal.App.4th 1, 7.) "Because [section 245] speaks to *the capability of inflicting significant injury*, neither physical contact nor actual injury is required to support a conviction." (*Ibid.*)

Here, substantial evidence shows defendant assaulted the four victims by means of force likely to produce great bodily injury. (§ 245, subd. (a)(4).) After defendant forced the four victims to sit down in the living room, he sprayed each of them with flammable, butane lighter fluid on their chest and torso areas, and threatened to light them on fire. Lofton testified that defendant "eventually [found] a lighter."

Though Lofton was the only witness who testified that defendant found a lighter, his testimony that defendant was in possession of a lighter, while the assaults were ongoing, was enough to show that defendant "had the present ability to apply force likely to produce great bodily injury" on each of the four victims whom defendant sprayed with lighter fluid. (CALCRIM No. 875; Evid. Code, § 411.)

E. *The Trial Court Had No Duty to Instruct on Simple Assault as Lesser Included Offenses to the Aggravated Assault Charges in Counts 4 Through 7*

A trial court has a duty to instruct on a lesser included offense only "if there is substantial evidence the defendant is guilty of the lesser offense, but not the charged offense." (*People v. Breverman* (1998) 19 Cal.4th 142, 177.) In a second challenge to his aggravated assault convictions in counts 4 through 7, defendant claims there was substantial evidence that he committed simple assault (§ 240), but not assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)). Thus, he argues, the trial court had a duty to instruct on simple assault as a lesser included offense to the assault by means of force likely to produce great bodily injury.

A simple assault is "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240; *People v. Wyatt* (2012) 55 Cal.4th 694, 702.) To be sure, a simple assault is a lesser included offense of assault by means of force likely to produce great bodily injury. (*People v. Berry* (1976) 18 Cal.3d 509, 518-519.) An assault by means of force likely to produce great bodily injury requires that the defendant have the present ability to apply force *likely to produce great bodily injury* on someone, while the crime of simple assault only requires that the defendant have the present ability to *apply force* to someone—force not likely to produce great bodily injury. (See *id.* at p. 519; CALCRIM Nos. 875 [aggravated assault], 915 [simple assault].)

Here, there was no evidence that defendant committed only a simple assault, but not assault by means of force likely to produce great bodily injury, on the victims in

counts 4 through 7, Lofton, Guy, Westenhaver, and Pelczynski.  As indicated, the trial court's duty to instruct on lesser included offenses obtains only "when the evidence raises a question as to whether all of the elements of the charged offense were present [citation] but not when there is no evidence that the offense was less than that charged. [Citations.]"  (*People v. Breverman*, *supra*, 19 Cal.4th at p. 154.)

Defendant claims instructions on simple assault were required because there was evidence that he *did not* find and therefore did not possess a lighter, or the present ability to inflict great bodily injury on the victims by lighting them on fire.  To be sure, though Lofton testified that defendant "eventually [found] a lighter," Pelczynski testified that defendant looked "all over the place" for a lighter but could not find one.  We disagree that Pelczynski's testimony was sufficient to support instructions on simple assault.

As the trial court observed in denying defendant's request to instruct on simple assault, "the evidence in those counts is either [defendant] threw the lighter fluid on the victims and threatened to set them on fire, . . . or [he] did not.  It's not the matter of [an] incomplete act that a simple assault instruction would support."  Indeed, even if the jury believed Pelczynski's testimony that defendant never found, and was never in possession of, a lighter, all of the victims testified defendant threw lighter fluid on them, threatened to set them on fire, and was looking for a lighter.  It was only a matter of time before defendant found a lighter or some other means to light the victims on fire.  Thus, there was no evidence that defendant did not have the present ability to apply force *likely to*

*produce great bodily injury* on the victims, and no evidence to support instructions on simple assault.

F. *Substantial Evidence Supports the Gang Enhancements in Counts 14 Through 16*

As indicated, defendant was convicted of three counts of dissuading witnesses (§ 136.1) Amber Guy (count 14), Andrew Loften (count 15), and Kristin Westenhaver (count 16), and the jury found gang enhancement allegations true in each of these counts (§ 186.22, subd. (b)).

Defendant claims there is insufficient evidence to support the gang enhancements in counts 14, 15, and 16. He argues the testimony of the prosecution's gang expert, Officer Smith, was "too vague and conclusory" to show that defendant's gang, Public Enemy Number One, or "PEN1", had the requisite "primary activities," or that its members had engaged in a "pattern of criminal gang activity" to qualify PEN1 as a "criminal street gang" for purposes of the gang enhancements. (§ 186.22, subds. (e), (f).)

More specifically, defendant argues there was no "way [for the jury] to discern" that the crimes Officer Smith specified were the primary activities of PEN1, or that the individuals he identified as committing "the offenses proffered as a pattern of criminal activity" were members of PEN1. Though we agree that some of Officer Smith's gang expert testimony was not as clear or specific as it may have been, the record nonetheless contains sufficient substantial evidence to support the "pattern of criminal gang activity" and "primary activities" elements of the gang enhancements.

1. Relevant Background

At the trial in May 2013, Officer Smith testified as a gang expert for the prosecution. He had been a sworn peace officer since 1988, and for the previous 14 years he had been supervising "a specialized caseload dealing with [W]hite supremacist groups," including people on formal probation who were connected with White supremacists gangs and groups. He had undergone "basic gang training" in the probation officer's academy, specializing in White supremacist gangs and groups, and he had additional gang-related training through the California Department of Corrections and Rehabilitation, the Anti-Defamation League, and the California Gang Investigators Association. He was currently teaching a "California State Corrections certified course in [W]hite supremacists gangs and groups."

Officer Smith had conducted "over 2,100 operations" on White supremacist gangs and groups, and had come into personal contact with gang members over 2,100 times. He supervised a caseload of probationers who were connected with White supremacist gangs and groups, and White supremacist gang members had told him "just about everything" about "the gang," including its "current operations, activities, members, [and] associates." He frequently spoke with other probation officers and police officers about criminal street gangs.

Officer Smith opined that crimes like dissuading or threatening a witness would benefit a White supremacist gang, because it would prevent a possible conviction and allow the gang to "keep operating." Selling drugs also benefited White supremacist

gangs, because it allowed the gang to get more drugs and guns. Officer Smith was "very familiar" with the Aryan Nation and Public Enemy Number One, or PEN1. The Aryan Nation was a "Christian identity based" group involved in "hard-core" White supremacist activities, including hate-related crimes. By contrast, PEN1 was a "criminal based type group," closely allied with the prison gang Aryan Brotherhood. Aryan Brotherhood was involved in "narcotics trafficking." Aryan Nation was not involved in "illicit narcotics" because it was against the group's religious beliefs.

Aryan Nation had 3,000 members nationwide; Aryan Brotherhood had no more than 200 members; and PEN1 had at least 350 members. Officer Smith had investigated crimes committed by all three groups. Aryan Nation was the "ultimate goal of any [W]hite supremacist"; it recruited members from PEN1 and it would try to get PEN1 members off of drugs. PEN1's common name was PEN1 or the "the PEN1 Death Squad," and one of its common identifying symbols was "88" which meant "HH" or "Heil Hitler."

In Officer Smith's opinion, PEN1 was a "criminal street gang." And, based on his review of police reports, classification forms, and defendant's tattoos (which included "Public Enemy Number One" across his back), Officer Smith opined that defendant was a member of PEN1, and PEN1 members had "individually or collectively" "engaged in a pattern of criminal activity." Based on his review of police reports regarding PEN1 member Jesse Moncha, Officer Smith concluded that Moncha was "involved in heavy narcotics sales." Officer Smith had also worked for many years with self-admitted PEN1

member Kenneth Bronson. On June 1, 2005, Bronson was in possession for sale of a controlled substance in violation of Health and Safety Code section 11378. On June 7, 2009, another PEN1 gang member, Daniel (or David) Svedin, committed a battery with serious bodily injury.

Officer Smith also opined that the primary activities of PEN1 were "to make money. It's identity theft, fraud, anything that will allow the criminal enterprise to continue and prosper . . . . Like, it's off the charts with identity theft with these guys." Dissuading witnesses from coming to court and testifying, and methamphetamine sales, were also primary activities of PEN1.

2. Analysis

As indicated, "'[o]ur role in considering an insufficiency of the evidence claim is quite limited.'" (*In re Alexander L.* (2007) 149 Cal.App.4th 605, 610.) We review the record "in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson*, *supra*, 26 Cal.3d at p. 578.) This standard of review applies to convictions on substantive offenses and to true findings on gang enhancement allegations. (*People v. Ortiz* (1997) 57 Cal.App.4th 480, 484.)

Section 186.22, subdivision (b)(4), provides for enhanced penalties on "[a]ny person who is convicted of a felony . . . committed for the benefit of, at the direction of, or in association with any criminal street gang . . . ." A "'criminal street gang' means any

ongoing organization, association, or group of three or more persons . . . having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).)

"Therefore, the 'criminal street gang' component of a gang enhancement requires proof of three essential elements: (1) that there be an 'ongoing' association involving three or more participants, having a 'common name or common identifying sign or symbol'; (2) that the group has as one of its 'primary activities' the commission of one or more specified crimes; and (3) the group's members either separately or as a group 'have engaged in a pattern of criminal gang activity.' [Citation.]" (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1222; § 186.22, subds. (e), (f).)

Defendant does not challenge the sufficiency of the evidence that PEN1 was an ongoing association involving three or more participants having a common name or common identifying sign or symbol. (§ 186.22, subd. (f).) Instead, he claims Officer Smith's testimony was "too vague and conclusory" to show that PEN1 had the requisite "pattern of criminal gang activity" to qualify as a criminal street gang. (§ 186.22, subds. (e), (f).) He also claims Officer Smith's testimony was insufficiently reliable, or lacked a sufficient foundation, to show that PEN1's "primary activities" included the commission of one or more statutorily enumerated offenses. (§ 186.22, subds. (e), (f).)

41

(a) *The "Pattern of Criminal Gang Activity" (Predicate Offenses) Element*

A pattern of criminal gang activity means the commission, attempted commission, conspiracy to commit, solicitation of, juvenile adjudication, or conviction of *two or more* of any of the offenses listed in section 186.22, subdivision (e), "provided at least one of these offenses occurred after [September 23, 1988] and the last of those offenses occurred within three years after a prior offense, and the offenses were committed *on separate occasions, or by two or more persons . . . .*" (§ 186.22, subd. (e), italics added; *People v. Gardeley* (1996) 14 Cal.4th 605, 625 (*Gardeley*).)

Defendant argues Officer Smith's testimony was insufficient to show that alleged PEN1 members Moncha and Bronson committed qualifying predicate offenses, after September 23, 1998, and within three years of each other. Thus, defendant claims, there was insufficient evidence to satisfy the pattern of criminal gang activity element of the gang enhancements. (Pen. Code, § 186.22, subd. (e); *Gardeley*, *supra*, 14 Cal.4th at p. 625.) We agree that Officer Smith's testimony concerning the narcotics-related crimes committed by Moncha and Bronson was insufficient to satisfy the pattern of criminal gang activity. Officer Smith testified only that Moncha was "involved in heavy narcotics sales," and that on June 1, 2005, Bronson was in possession for sale of a controlled substance in violation of Health and Safety Code section 11378.

Though the sale or possession for sale of a controlled substance is a qualifying predicate offense (§ 186.22, subd. (e)(4)), and section 186.22, subdivision (e) does not require proof of a conviction, but only that the offense was committed (*People v. Garcia*

42

(2014) 224 Cal.App.4th 519, 524), there was no showing, through Officer Smith's testimony or otherwise, that Moncha and Bronson committed qualifying predicate offenses *within three years of each other* and after September 23, 1988 (§ 186.22, subd. (e)). There was no mention of *when* Moncha was "heavily involved in narcotics sales," or when he committed any other crime. Battery with serious bodily injury, the crime that Officer Smith testified that PEN1 member Svedin committed on June 7, 2009, is not a qualifying predicate offense. (§ 186.22, subd. (e).)

But as the People point out, the trier of fact may consider *the charged offenses* in determining whether members of the alleged criminal street gang have engaged in a pattern of criminal gang activity. (See *Gardeley*, *supra*, 14 Cal.4th at pp. 625-626.) And here, substantial evidence shows *defendant* was a PEN1 member and that *defendant* engaged in a pattern of criminal gang activity by committing two statutorily enumerated or qualifying predicate offenses, on two separate occasions, after September 23, 1988, and within three years of each other. (§ 186.22, subds. (e), (f).)

First, substantial evidence shows defendant was a member of PEN1. Officer Smith was "very familiar" with PEN1, based on his years of experience in speaking with members of White supremacist gangs and investigating crimes committed by White supremacist gang members, including PEN1 members. PEN1 was a "criminal based type group," closely allied with the prison gang Aryan Brotherhood. Officer Smith opined that defendant was a member of PEN1 based on police reports, classification forms, and defendant's numerous White supremacist-related tattoos, including a "Public Enemy

43

Number One" tattoo on his back. This evidence was sufficient for the jury to conclude beyond a reasonable doubt that defendant was a PEN1 member.

Second, assault by means of force likely to produce great bodily injury, dissuading witnesses, and criminal threats, are qualifying predicate offenses. (§ 186.22, subd. (e)(1) [aggravated assault], (e)(8) [dissuading witnesses], (e)(24) [criminal threats].) And based on the testimony of Lofton, Guy, Pelczynski, and Westenhaver, substantial evidence shows that defendant committed four counts of criminal threats (§ 422) and four counts of assault by means of force likely to produce great bodily injury (§ 245) during the June 22, 2009, incident. The evidence also showed that, while defendant was in custody following the June 2009 incident, but within three years of that incident, he committed three counts of dissuading witnesses. (§ 136.1.) Based on this evidence, substantial evidence shows, and the jury could have concluded beyond a reasonable doubt, that PEN1 had engaged in a pattern of criminal gang activity.

Defendant points out that the prosecutor "elected not to rely" on defendant's current offenses to establish the pattern of criminal gang activity element in closing argument, but instead relied on the insufficient evidence of the crimes committed by other gang members, including Moncha and Bronson. He argues that the People "should not be heard now to make a different election," and the true findings on the gang enhancements must be reversed based on the prosecutor's election. We disagree. The jury unanimously found defendant guilty of the charged crimes which, as explained, were sufficient to support the pattern of criminal gang activity element, and the jury was

44

instructed that if it found defendant guilty of the charged crimes, it could consider those crimes in determining whether the pattern of criminal gang activity element was proved. The jury was also instructed that it could "not find that that there was a pattern of criminal gang activity" unless it unanimously agreed that "two or more crimes that satisfy these requirements were committed." The jury effectively made this finding by unanimously finding defendant guilty of the charged crimes. (*People v. Bragg* (2008) 161 Cal.App.4th 1385, 1401-1402 [charged offenses may be considered in determining pattern of criminal gang activity element, and prosecutor's reliance on nonqualifying offense was "of no moment" because the jury was instructed it could consider the defendant's current offenses as predicate offenses].)

(b) *The "Primary Activities" Element*

Defendant next argues that Officer Smith's expert gang testimony was insufficiently reliable, or lacked a sufficient evidentiary foundation, to show that one of the primary activities of PEN1 was the commission of one or more of the crimes listed in paragraphs (1) through (25), or (31) through (33), of section 186.22, subdivision (e). (§ 186.22, subd (f).) We disagree.

"The phrase 'primary activities' . . . implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.) Both past and present conduct by gang members involving the commission of one or more of the

statutorily enumerated offenses, and the charged offenses, are relevant in determining the group's primary activities.  (*Ibid*.)

Officer Smith testified that the primary activity of PEN1 was "to make money. It's identity theft, fraud, anything that will allow the criminal enterprise to continue and prosper . . . . Like, it's off the charts with identity theft with these guys."  The officer also testified that dissuading witnesses from coming to court and testifying and methamphetamine sales, were primary activities of PEN1.  Witness dissuasion and methamphetamine sales are statutorily enumerated offenses (§ 186.22, subd. (e)(4) [methamphetamine sales] and (e)(8) [witness dissuasion].)

Defendant maintains there was no showing that the basis evidence, including the hearsay information, underlying Officer Smith's opinion was sufficiently reliable for the jury to have concluded beyond a reasonable doubt that PEN1's primary activities included one or more qualifying offenses, including witness dissuasion or methamphetamine sales.  Defendant argues:  "Officer Smith did not testify that his opinion as to PEN1's primary activities was based on highly reliable sources such as court records of convictions.  Nor did he testify, as did the [gang expert] in . . . *Gardeley*, [*supra*, 14 Cal.4th 605] that he had learned of PEN1's activities from the defendant, himself, and from the admissions against penal interest of other gang members."

To be sure, and as defendant argues, "courts have repeatedly held that *vague hearsay* is insufficient to prove *the commission of crimes by gang members*."  (Italics added.)  (*In re Nathaniel C.* (1991) 228 Cal.App.3d 990, 1003-1004 [expert testimony

46

insufficient to show that qualifying predicate offense was committed by gang member]; *In re Leland D.* (1990) 223 Cal.App.3d 251, 258-260 [evidence that gang members had been arrested insufficient to show that any of them had ever committed a qualifying predicate offense]; *In re Alexander L.*, *supra*, 149 Cal.App.4th at pp. 611-614 [expert testimony lacked sufficient foundation to show that gang's primary activities included commission of qualifying predicate offenses, because information establishing the reliability of the expert's opinion was never elicited].)

As defendant also points out, the gang expert testimony in *Gardeley* was sufficient to establish the primary activities and pattern of criminal gang activity elements of the gang enhancements, because it was based on (1) the expert's direct conversations with the defendant and other gang members, (2) the expert's personal investigations of hundreds of crimes committed by gang members, and (3) information the expert learned from his colleagues and other law enforcement agencies. (*Gardeley*, *supra*, 14 Cal.4th at pp. 618-620.) More generally, "[a]n expert may generally base his opinion on any 'matter' known to him, including hearsay not otherwise admissible, which may 'reasonably . . . be relied upon' for that purpose. (Evid. Code, § 801, subd. (b) . . . .)" (*People v. Montiel* (1993) 5 Cal.4th 877, 918.) And, as noted in *Gardeley*, "[o]f course, any material that forms the basis of an expert's opinion testimony must be reliable. [Citation.] . . . 'Like a house built on sand, the expert's opinion is no better than the facts on which it is based.' [Citation.]" (*Gardeley*, *supra*, at p. 618.)

Here, there was a reliable evidentiary foundation to support Officer Smith's expert opinion that the primary activities of PEN1 included the statutorily enumerated offenses of witness dissuasion and methamphetamine sales. Officer Smith had conducted "over 2,100 operations" on White supremacist gangs and groups and had over 2,100 personal contacts with gang members. He supervised a caseload of probationers connected with White supremacist gangs and groups, and White supremacist gang members had told him "just about everything" about "the gang," including its "current operations, activities, members, [and] associates." Officer Smith had frequently spoken with other probation officers and police officers about criminal street gangs. Based on Officer Smith's testimony, the jury could have concluded beyond a reasonable doubt that the primary activities of PEN1 included witness dissuasion and methamphetamine sales.

G. *There Was No Cumulative Error*

Defendant claims the cumulative effect of the trial court's errors—its dilution of the reasonable doubt standard in jury voir dire, its improper delegation to the bailiff of its authority to handcuff defendant and remove him from the courtroom, and its failure to instruction on simple assault—requires reversal of all of the convictions and sentencing enhancements. As explained, there was no error in any of these respects, and any possible error by the trial court in allowing the bailiff to handcuff and temporarily remove defendant was harmless beyond a reasonable doubt. Thus, there is no cumulative error to evaluate. (*People v. Thornton* (2007) 41 Cal.4th 391, 453.)

48

H. *The Additional 10-year Terms Imposed on the Gang Enhancements on Counts 14, 15, and 16 Must be Stricken*

Defendant claims, and the People and we agree, that the consecutive 10-year terms imposed for the gang enhancements on counts 14, 15, and 16, must be stricken. (§ 186.22, subd. (b)(1)(C).)  Instead, minimum parole eligibility periods of seven years must be imposed on the 25-year-to-life terms imposed on counts 14, 15, and 16. (§ 186.22, subd. (b)(4)(C).)

As indicated, defendant was convicted in counts 14, 15, and 16 of dissuading a witness in violation of section 136.1.  Defendant was sentenced to consecutive terms of 25 years to life on counts 14, 15, and 16, based on his two prior strike convictions. (§ 667, subds. (b)-(i).)  Consecutive 10-year terms were also imposed on counts 14, 15, and 16 based on the gang enhancements on those counts, pursuant to section 186.22, subdivision (b)(1)(C).

Section 186.22, subdivision (b) provides for *alternative* methods of punishing felons whose crimes were committed for the benefit of a criminal street gang.  (*People v. Lopez* (2005) 34 Cal.4th 1002, 1004.)  By its terms, subdivision (b)(1) of section 186.22 applies "'[e]xcept as provided in paragraphs [(b)](4) and [(b)](5).'"  Thus, punishment for a gang enhancement, as provided in subdivision (b)(1) of section 186.22, may not be imposed when an alternative form of punishment provided for in subdivision (b)(4) or (b)(5) applies instead.  (*People v. Louie* (2012) 203 Cal.App.4th 388, 396.)

Section 186.22, subdivision (b)(1)(C), which the trial court applied here, requires the court to impose a 10-year term on any felony that is a violent felony as defined in subdivision (c) of section 677.5, which includes any felony punishable by life imprisonment.  Defendant's witness dissuasion convictions in counts 14, 15, and 16 were felonies punishable by 25 years to life in prison, under the "Three Strikes" law.  (§ 667, subds. (b)-(i).)  But the consecutive 10-year terms imposed on counts 14, 15, and 16, pursuant to subdivision (b)(1)(C), were improperly imposed because the alternative punishment provided in subdivision (b)(4)(C) applied in lieu of the 10-year terms called for by subdivision (b)(1)(C).  Subdivision (b)(4)(C) of section 186.22 provides that any person convicted of a felony for the benefit of a criminal street gang shall "be sentenced to an indeterminate term of life imprisonment," with a minimum parole eligibility period of seven years, if the felony is "threats to victims and witnesses, as defined in Section 136.1."

As one court has explained:  "For most felonies punishable by a determinate term, the sentence will be enhanced by a term of years under section 186.22, subdivision (b)(1).  But when the defendant has been convicted of a felony that already carries a life sentence, there is no specific enhancement for a term of years."  (*People v. Johnson* (2003) 109 Cal.App.4th 1230, 1237.)  And if, as here, the felony that already carries a life sentence is witness dissuasion in violation of section 136.1, the defendant must serve at least seven years of the life term before being considered for parole.  (§ 186.22, subd. (b)(4)(C); see *People v. Sengpadychith*, *supra*, 26 Cal.4th at p. 327.)

50

## IV.  DISPOSITION

The three 10-year determinate terms imposed consecutive to the 25-year-to-life terms on defendant's witness dissuasion convictions in counts 14, 15, and 16 are stricken. Instead, defendant is ordered to serve at least seven years of each 25-year-to-life term imposed on counts 14, 15, and 16, before he may be considered eligible for parole. (§ 186.22, subd. (b)(4)(C).)  The matter is remanded to the trial court with directions (1) to prepare a supplemental sentencing minute order and an amended abstract of judgment reflecting these changes to defendant's sentence, and (2) to forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

MILLER
Acting P. J.

SLOUGH
J.

51